**F. D. CUMMER & SON CO. v. ATLAS DRYER CO. et al.**

(Circuit Court of Appeals, Sixth Circuit. January 3, 1912.)

No. 2,153.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DRYER.

The Cummer patent, No. 545,120, for a dryer, for drying paint, powder, drugs, and other material, claims 7, 8, 9, and 10 are void for lack of patentable invention in view of the prior art. Claim 11 *held* valid and infringed, and claims 12, 21, 22, 23, and 28 not infringed.

2. PATENTS (§ 283*)—UTILITY—ESTOPPEL BY INFRINGEMENT.

An infringer who has appropriated distinctive features of a patented invention cannot deny their patentable utility.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 452; Dec. Dig. § 283.*]

3. PATENTS (§ 151*)—INFRINGEMENT—INJUNCTION.

Where some of the claims sued on are found invalid, but others are held valid and infringed, complainant must disclaim the invalid claims before taking an injunction upon those found valid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 225; Dec. Dig. § 151.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

· Appeal from the Circuit Court of the United States for the Northern District of Ohio.

Suit in equity by the F. D. Cummer & Son Company against the Atlas Dryer Company and William M. Cummer. Decree for defendants, and complainant appeals. Reversed in part.

J. B. Fay, for appellant.

R. H. Parkinson and C. R. Miller (Weed, Miller & Rothenberg and Hoyt, Dustin, Kelley, McKeehan & Andrews, on the brief), for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Suit for injunction and accounting based on claims 7, 12, 21, 23, and 28 of patent to F. D. Cummer, No. 545,120, issued August 27, 1895, application filed March 5, 1895.

[1] The patent here in suit pertains to the art of drying various materials, and particularly to that type of dryer which employs a long, inclined, rotating, metallic cylinder through which the materials pass from the higher to the lower end, being, by the rotating movement and by internally projecting blades or flanges, carried part way up the side of the cylinder and then falling or cascading off the flanges to the bottom, in the course of their progress toward the lower end, while hot combustion products pass through the cylinder in the opposite direction. Such cylinders are mounted above a furnace and in the line of the draft therefrom, and are provided with a fan to accelerate the hot air draft. As thus generally described, they must, with reference to the patent in suit, be considered with the same effect as if a part of the prior art, because embodied in Cummer's own patent No. 545,058, which, although bearing the issue date, August 27, 1895, was applied for April 9, 1894, and expired November 30, 1907, because of having been patented November 30, 1893, in England.

It is obvious that in this type of apparatus the drying is accomplished, first, by the heat applied to the outside of the cylinder shell and so affecting the materials inside of the shell, and, second, by the direct contact of the furnace gases with the drying materials as the two pass through the interior of the cylinder, and that, so far as concerns this second result, the hot gases, on entering the cylinder at its lower or tail end, at once begin to absorb moisture from the materials, and may reach their limit of absorptive efficiency before they have come to the upper or air exit end. It follows that the upper end portion of the cylinder will, or may be, more or less inoperative in this respect.

In an earlier structure of the same class, as shown in patent No. 245,980, issued August 23, 1881, to A. G. Smith, the combustion products had been brought into direct and intimate contact with the drying materials in another way. Smith provided his cylinder shell with numerous small openings or inlets, through which the hot gases entered, mingling directly with the materials, and passing out of a stack at one end. In this way, the materials were, upon entering the cylin-

der, and continually in their progress, exposed to fresh supplies of perfectly dry gases.

Cummer, in the specification of the patent in suit, points out the desirability in many cases of controlling the conditions in the respective parts of the interior of the cylinder shell, with regard to the nature of the materials to be dried. For example, considering the cylinder as divided across its length into upper, central, and lower thirds, some materials would require the upper third to be hottest and the lower third coolest, while other materials would require the contrary. He claims to accomplish entire control in these respects by using all parts of his construction, and to accomplish less complete but very useful control by the use of portions only of his described apparatus. Adopting, in general, the structure of his earlier patent, he scattered inlet openings over the surface of his shell, each inlet opening having a radial pipe extending a short distance inwardly and ending in a flaring hood turned toward the head end of the cylinder. Instead of using a solid arch which would carry all the furnace gases back to enter the rear and lower open end of the cylinder, he perforated this arch with frequent openings communicating with a hot chamber above the arch and beneath the cylinder. He also provided, communicating directly or indirectly with this hot air chamber, a series of doors opening to the outer air, whereby cold air could be brought, with more or less efficiency, to the desired part of this hot air chamber and so affect the air entering the cylinder through the shell inlets in that vicinity. In operation the furnace would be raised to a very high temperature, the combustion products would be free from what is commonly called smoke, and the natural draft and the suction fan would draw these products, partly through the shell inlets and partly through the open lower end, up, along, and out at the upper end of the shell. The patented dryer has been successfully adopted, for drying paint, powder, drugs, pulp, and a great variety of materials, and sales are said to have amounted to one million dollars.

Claims 7 and 8 can be considered together. Claim 7 reads:

"The drying cylinder open at both ends for the passage of material and the products of combustion in opposite directions, and having inlet openings through the side of the cylinder, substantially as set forth."

Claim 8 is the same as claim 7, with the addition of the suction fan and with the specification that the inlet openings through the wall of the cylinder are "covered."

The structure of these two claims differs from the earlier Cummer patent only in the presence of the (covered) inlet openings through the walls of the cylinder, and the question arising thereon is whether this addition involved invention. This requires further examination of the Smith patent, above cited. Smith's cylinder inlet openings had pipes extending radially a short distance into the cylinder. The products of combustion passed through these openings into the interior of the cylinder and along the same with the advancing materials to be dried until, at the tail end, the combustion products were discharged upward through the stack, and the dry product downward through the chute. In Smith, as in Cummer, the openings admitted the products

of combustion into the interior of the cylinder in direct contact with the materials being treated. In Smith, as in Cummer, the gases were carried, from these inlet openings toward the center of the cylinder by radial pipes. Smith did not have the flaring hoods of Cummer, but these are not called for by either one of these claims. So far as the device covering the inlet openings in the shell acted merely as a shield or cover to keep the contents which were near the shell from escaping through the opening, the radial pipes, in each case, performed that function. The only differences are that in Smith all the combustion products entered the cylinder through the side inlets, and, when inside, moved along with the materials, while in Cummer part of the products entered the cylinder in this way and part at the open tail end, and all the combustion products moved in a direction opposite to the motion of the materials. Under these conditions, we think invention was not involved in what Cummer did. Smith disclosed fully the idea of carrying the products of combustion through covered openings in the side of the shell into immediate contact with the inner materials. Neither the theory of operation nor the practical effect of the Smith inlets is modified or changed in their application to the Cummer cylinder. That they discharge into an air current going in one direction, instead of in another, or that they admit only part instead of all the gases, is not a new result, nor does it involve novel co-action so as to support a claim whose only novelty lies therein. Electric Mfg. Co. v. Perkins Electric, etc., Co. (C. C. A. 6) 179 Fed. 511, 513, 103 C. C. A. 116; National Tube Co. v. Aiken (C. C. A. 6) 163 Fed. 260, 91 C. C. A. 114.

Claims 9 and 10 call substantially for the device of the expired Cummer patent in combination with a perforated arch constructed and operating as we have described. In the view which we adopt, the distinctions between the two claims are immaterial. A perforated arch above the fire box, to permit some of the combustion products to pass directly up and contact with the metal shell to be heated, was old in boiler settings, and we do not see any new operation or result nor any patentable invention, just because the metallic shell contains air to be heated instead of water to be heated. We think these claims are invalid.

Claims 11 and 12 may also be considered in connection with each other. Claim 11 reads:

"The furnace and the perforated arch beyond the furnace over the line of draft, and a drying cylinder set into the line of draft above said perforated arch and provided with covered openings to admit heat into the cylinder about its side, substantially as set forth."

[2] This claim specifies an operative combination, including the perforated arch and the perforated cylinder shell. It results from this combination, as described, that the hottest gases, necessarily found nearest the fire box, may, and to some extent will, pass directly up through the nearest perforation, and directly into the head of the cylinder where the material is wettest and can endure the greatest heat without injury, and that, as the gases pass back away from the fire box and will necessarily drop somewhat in temperature, they pass

up through perforations and into opposite inlet openings in the cylinder. This variation between the temperature of the combustion products just from the fire box and the temperature of the same products carried back to the rear end of the cylinder is accentuated, and made more important by the fact that the described cylinder is 30 feet long. This construction and operation will tend to produce in the interior of the cylinder, temperatures corresponding to those existing in those parts of the arch directly beneath, and so will tend to bring it about that the products of combustion in the tail end of the cylinder, in contact with the materials nearly dry, will be cooler than some of the combustion products in the head of the cylinder, in contact with material wholly undried. This result is one of those contemplated by the specification, and theoretically following from the construction. Whether it exists in sufficient degree to be of great practical utility is in dispute, but the defendants have adopted this construction and obtained whatever advantage in it there may be, and they cannot dispute its patentable utility. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 440, 441, 31 Sup. Ct. 444, 55 L. Ed. 527.

This combination and this result seem to be quite new. In Smith, the only earlier example of the perforated cylinder needing consideration, there was a unitary temperature in the different parts of the hot air chamber beneath the cylinder; or, if not entirely unitary, there was no such gradation as is accomplished by Cummer. Smith did indicate an intention to control the temperature in this hot air chamber, through the independent manipulation of a series of side openings into the outer air, suggesting, though not very clearly disclosing, that it would have been possible to make one end of the chamber cooler than the other end; but he does not describe this result, it is not clear that he had it in mind, and, giving his disclosure the broadest effect, it does not anticipate Cummer's automatic application of the highest degree of heat at the entrance point of the wet material. Such a suggestion, or imperfect disclosure, does not anticipate.

With the construction which we give this claim, infringement is clear. Defendant has inlet openings so covered that the air may come in and the materials may not fall out. This, we think, is the only limitation imposed upon claim 11 by the use of the words "covered opening."

Claim 12 does not seem materially distinguishable from claim 11, except by calling for "hooded inlet openings" rather than for merely "covered openings." Giving effect to this distinction, as we should, defendants do not infringe this claim. They have no hood which is anything more than the cover of claim 11. The chief, if not the only useful, purpose of the flaring hood of Cummer is to aid the suction fan in inducing draft through the inlet. This office is not performed by anything in defendant's structure.

Claim 21 does not, from the point of view we have taken, essentially differ from claim 8, except, perhaps by its reference to hoods, and that subject is covered by what we have said regarding claim 12. We hold this claim not infringed.

Claims 22 and 23 are not said to have any distinguishing and patent-supporting feature, except that they call for a drying cylinder, having its front end projected outside of the furnace chamber, whereby the material, in the first part of its progress through the cylinder, will not come in contact with a very hot shell. It was concededly old to project the front end of the cylinder outside of the drying chamber sufficiently to make operating contact with the rotating means, and Cummer prolonged this extension for the purpose stated. We do not find in defendant's structures any projection other or further than is suitable to carry the operating gears. The construction there present may accomplish something of the effect claimed by the patent, but, if so, it is an effect necessarily incidental to the employment of a familiar arrangement of parts. These two claims are not infringed.

The twenty-eighth claim reads:

"The furnace having a perforated arch at its rear and a chamber over said arch having air inlets at its side, substantially as set forth."

It is not said this claim has been infringed by the defendants, save in one structure; i. e., the dryer they built for the Du Pont Powder Company. The drawings of this dryer show a chamber over the perforated arch and show a central dryer support which more or less divides the chamber into two sections, and show one door opening from the outside into each of these sections. These doors are said to be, and may be, ordinary cleanout doors. Two would be appropriate, if not necessary, for that purpose. There is no evidence that they were intended to be used or ever were used or are capable of efficient use as air inlets in the manner and for the purpose described in the patent. Assuming that there may be invention in the combination of the patent to which this claim is directed, and that it is not inoperative for lack of including any element (as, the cylinder) upon which the heat may take effect, we think no infringement is established.

[3] It results from these views that, in all respects except with reference to claim 11, the decree below should stand; but that complainant was, as to that claim, entitled to the usual decree for injunction and accounting. Under the practice pointed out in Morgan Co. v. Alliance Co., 176 Fed. 100, 100 C. C. A. 30, and Herman v. Youngstown Co., 191 Fed. 579 (decided by this court November 7, 1911), the complainant should have 30 days after the mandate is filed in the court below within which to file certified copy of a disclaimer as to claims 7, 8, 9, and 10, and, in the absence of such disclaimer, the bill should be dismissed.

The appellant will recover the costs of this appeal. Neither party will recover costs in the court below upon the proceedings so far had. R. S. § 4922 (U. S. Comp. St. 1901, p. 3396); Yale Lock Co. v. Sargent, 117 U. S. 536, 553, 6 Sup. Ct. 934, 29 L. Ed. 954.